UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
F I L E D
JUN 3 0 2006
AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 05-416-GWU

DONNA S. JACKSON, PLAINTIFF,

VS. **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of her application for Supplemental Security Income (SSI). The appeal is currently before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991); Crouch v. Secretary of Health and Human Services, 909 F.2d 852, 855 (6th Cir. 1990). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Crouch, 909 F.2d at 855.

1

The regulations outline a five-step analysis for evaluating disability claims. See 20 C.F.R. Section 404.1520.

One of the steps of the analysis, the severity regulation, has been held to be a de minimus hurdle in the disability determination process. Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir. 1986). An impairment can be considered not severe only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985). Essentially, the severity requirements may be used to weed out claims that are "totally groundless." Id., n.1.

## DISCUSSION

The plaintiff, Donna S. Jackson, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of discogenic and degenerative disorders of the back and borderline intellectual functioning. (Tr. 18). Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ determined that the plaintiff retained the residual functional capacity to perform a significant number of jobs existing in the economy and, therefore, was not entitled to benefits. (Tr. 21-4). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ had asked the VE whether a person of the plaintiff's age, educational background, and work history could perform any jobs if she were limited to "light" level exertion, needed the option of sitting or

standing every 30 minutes and had a "limited but satisfactory" ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, handle instructions, and work within a regular schedule. (Tr. 430). The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies. (Tr. 430-1).

On appeal, this Court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence.

The plaintiff alleged disability due to a variety of physical problems, including back pain, as well as nervousness. (Tr. 94, 417, 419-21). Jewell Powell, a neighbor and relative by marriage, also testified at the administrative hearing that she had known the plaintiff since she was eleven or twelve years old and that she had always been a dependent person who had lived with her mother, even during a time when she had been married. (Tr. 424-5). Mrs. Jackson had been unable to hold down a job more than a week or so and was known to engage in certain childlike behaviors such as talking to toy dolls. (Tr. 425-6). In Mrs. Powell's opinion, the plaintiff would not been able to raise her children without help of her mother. (Tr. 427). She had never obtained a driver's license, and only drove within their neighborhood. (Tr. 427-8).

Medical records in the transcript include office notes from the plaintiff's treating sources at Corbin Psychiatric Counseling Service. The plaintiff's treating

3

psychiatrist, Dr. Nelson Rodriguez, started treating her in January, 2001 with diagnoses of major depressive disorder and an anxiety disorder. (Tr. 160). He initially prescribed Celexa and BuSpar, but several other medications were given as the plaintiff's treatment progressed. (e.g. Tr. 241-8). By mid-2003, Dr. Rodriguez was prescribing Xanax. (Tr. 323). On September 10, 2003, Dr. Rodriguez completed a mental residual functional capacity assessment stating that Mrs. Jackson had no useful ability to understand, remember, or carry out detailed instructions, maintain attention and concentration for extended periods, perform actions within a schedule, maintain regular attendance and be punctual, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, or travel in unfamiliar places or use public transportation. (Tr. 329-30). She would also have a "fair" (defined as "can perform the activity satisfactorily some of the time") ability to remember locations and work-like procedures, understand, remember, and carry out short, simple instructions, sustain an ordinary routine without special supervision, work with or near others without being distracted by them, make simple, work-related decisions, complete a normal work day or workweek, perform at a consistent pace, interact appropriately with the public, ask simple questions and request assistance, get along with co-workers and peers, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take

4

appropriate precautions, and set realistic goals or make plans independently of others. (Id.). The reasons given were depressed mood and anxiety attacks. (Id.).

The ALJ then obtained a consultative psychological examination by Dr. Kenneth Starkey, who interviewed Mrs. Jackson in December, 2003, and reviewed a few records from her family physician and physical therapy, but not from Dr. Rodriguez. (Tr. 354). Dr. Starkey noted that the plaintiff's mood was dysphoric and occasionally irritable, and her cognitive processing appeared to be slow. (Tr. 343). He commented that "overall, [she] appeared to be either under significant personal distress or experiencing the detrimental influence of too much psychoactive medications/substances." (Id.).[1] Although Mrs. Jackson stated that she had completed the tenth grade, her achievement testing showed sixth-grade level reading and fourth-grade level arithmetic, while IQ testing produced a verbal IQ of 62, a performance IQ of 63 and a full-scale IQ of 59, which placed her in the range of mild mental retardation. (Tr. 344-5). However, Dr. Starkey indicated that the scores appeared to be an underestimate of her actual abilities "due to seemingly poor motivation for attending to the tasks of the assessment, accompanied by the detrimental influence of psychoactive medication and/or depression." (Tr. 346). He thought that further IQ testing would yield an IQ score "probably" in the lower range of borderline intellectual functioning. (Id.). Dr. Starkey made a number of

---

[1] Her medications included orphenadrine, Meclizine, Lexapro, Xanax, Ultracet, Celebrex, Bextra, and Remeron. (Tr. 345).

5

diagnoses including a pain disorder, a depressive disorder, and nicotine dependence, as well as a "provisional" diagnosis of borderline intellectual functioning and a number of "rule out" diagnoses, including a substance-induced mood disorder, a dysthymic disorder, "detrimental influence of medication," and mild mental retardation. (Tr. 349). He assigned a current Global Assessment of Functioning score of 51, at the low end of the "moderate" range. (Tr. 350). Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition-Text Revision), p. 34. Dr. Starkey added that the plaintiff would need more effective psychiatric care before she "could" experience an improvement of her symptoms that would render her psychologically appropriate for vocational training or placement. (Tr. 350). Without the treatment that he had in mind, he felt that her prospects for being able to sustain gainful employment remained poor. (Id.). He also prepared a functional capacity form indicating that the plaintiff had a "seriously limited but not precluded" ability to function in many areas. (Tr. 352-3).[2]

The ALJ rejected Dr. Rodriguez's restrictions on the grounds that they were contradicted by the account of the plaintiff's daily activities given in her own

---

[2]The only other psychiatric opinion in connection with the plaintiff's current application predated the opinions of both Dr. Rodriguez and Dr. Starkey. Dr. Chintamani Vora examined the plaintiff in November, 2001, and diagnosed dysthymia. (Tr. 143-6). She assigned a GAF score in the "moderate" range, but gave some contradictory indications about the plaintiff's abilities. At one point she noted that Mrs. Jackson's ability to relate to others was "poor," but another point she stated that it was "fair." (Tr. 146-7). State agency reviewers who gave opinions did not have the benefit of a review of the treating physician's opinion, and apparently based their minimal restrictions on a prior ALJ denial decision, rather than any medical evidence. (Tr. 195-7, 223-5).

6

Jackson

testimony, and by the testimony and report of her friend Jewell Powell. (Tr. 19). However, as noted earlier, Jewell Powell had testified that the plaintiff was a dependent person who could do very little on her own (Tr. 424-5), which was consistent with her statements in a third party activities of daily living form completed in September, 2001. This indicated that the plaintiff stayed home and watched television most of the time, other than going to the doctor. (Tr. 112). It also states that the plaintiff could not repeat information correctly, and that her mother did most of the household chores. (Tr. 113). She was able to dress herself, talk on the telephone, and read the newspaper (Tr. 114-15), but these limited activities hardly seem to be of a degree which would clearly overcome the opinion of the treating psychiatrist. The plaintiff herself testified that she could not go into stores because she became nervous around people, that she was unable to sleep at night and spent most of the day on the couch, and that she always been too nervous to get a driver's license. (Tr. 418-20, 423). She had also been nervous running machines at her last job. (Tr. 415).

Moreover, the ALJ stated that she would give great weight to the opinion of Dr. Starkey, but she rejected the psychologist's more severe limitations based on her personal observations of the claimant at the hearing. (Tr. 19). The Court notes that Dr. Starkey appeared to base part of his opinion on his belief that the plaintiff was overmedicated, a field somewhat out of his area of expertise as a

7

psychologist.[3] In any event, Dr. Starkey's comments, even read in the light most favorable to the defendant, state that overmedication was only one possible reason for the plaintiff's poor performance on IQ achievement testing, and that the scores also could have been affected by depression. Dr. Starkey also indicated that without "more effective" psychiatric care, the plaintiff only had a "poor" prognosis for being able to sustain gainful employment. (Tr. 350).

In short, both the plaintiff's treating psychiatrist and the most recent examining psychologist gave more severe restrictions than accepted by the ALJ, and the only other examining mental health source during the relevant period contradicted herself. Given a lack of persuasive evidence that the plaintiff had greater abilities, a remand will be required for, at a minimum, an opinion from a medical expert who has access to all of the evidence.

The decision will be remanded for further consideration.

This the _30_ day of June, 2006.

_G. WIX UNTHANK_
SENIOR JUDGE

---

[3]Nor is it entirely clear that the plaintiff was simultaneously taking all the medications she had listed for Dr. Starkey. For instance, a mental health counselor at Dr. Rodriguez's office noted in November, 2003, that Mrs. Jackson's family physician, Dr. Richard Park, had recently switched her from Celebrex to Bextra (a similar medication) for insurance purposes. (Tr. 337). Both of these medications were on her list of medications given to Dr. Starkey a month later. (Tr. 345). It seems likely that the list was not reliable as an indication of what the plaintiff was taking at the time she saw Dr. Starkey.